Good afternoon. My name is Greg Laurie and I represent the appellants in the Sierra Forest Legacy v. Sherman case. With me at council table is Deputy Attorney General Janelle Richards. And Ms. Richards and I have coordinated our presentations today as much as possible to avoid duplication, and I hope we've succeeded in doing that. Unless the court would prefer otherwise, I will begin the discussion. I promise to yield the podium after about 10 minutes, and then Ms. Richards will address the Supreme Court's recent decision in the Geertsen Farms case, as well as some other issues that are relevant to the state's appeal. And our intention is to reserve about 10 minutes for rebuttal, a joint 10 minutes for rebuttal. Thank you. Okay. That's 15 and 15. Would you want to start with 30? Yeah, if that makes sense. Okay. So as the court is aware, at issue in both of these appeals is the Forest Service's decision to adopt the 2004 framework. This is a plan that calls for a five-fold increase in logging of large trees over a period of some 20 years throughout the Sierra Nevada, ostensibly as a means for generating revenue. The Forest Service adopted the 2004 framework without disclosing that scientists and agency experts across the board concluded that the plan would threaten the continued viability of imperiled wildlife in the Sierra Nevada. Rather than disclosing the scientific opposition, the Forest Service advised the public that impacts to wildlife were either unknown or uncertain and would be addressed through an adaptive management strategy that was undefined and, indeed, six years later, remains inchoate. In addition, this court has already determined that the Forest Service adopted the 2004 framework without considering any alternative plan, that would meet the purported purpose and need of generating revenue. Now, that got kicked back, and they've already done the SEIS. Is that right? They have released a draft SEIS, which is now being held in abeyance pending the outcome of this appeal, pursuant to the stipulation of the parties. I should say, however, that the SEIS, in our view, does not address the infirmities found, the alternatives of infirmities identified by this court, because it does not, in fact, look at any new alternatives. It, again, just references back to the alternatives for the 2001 framework and purports to recalculate the impacts from those alternatives based on the models that were used in the 2004 SEIS. So it addresses sort of perhaps part of the court's issue, the modeling issue, but not the, in our view, more important infirmity, which was the failure to consider alternatives to the 2004 framework, not just to the 2001 framework. It would be ‑‑ I don't want to throw you off track, but it would be useful, at least for me, to have some sense of what it is you're looking for. You started out by saying that this plan was predicated on logging to raise money to make the program go forward, but the other aspect that's involved in this is the fire control. I mean, Judge Englund was very heavy, in his opinion, in emphasizing the risks of fire, wildfires and the like. So I'm trying to get a handle on, if we were to agree with you in some respects, what is it that you're looking for? And if it's, I mean, I understand some, one of your positions, as I understand it, to go back to the 2001 framework and make that controlling of everything, but is that, is it sort of an all or nothing approach? You don't have to all, you know, that's sort of what's bothering me, is how all of this plays together, because we have competing interests here and the wildfire aspect happens to be something that everybody, I think, is concerned about. Absolutely, and I suspect I will address many of those issues as we go through the presentation, as will Ms. Richards. The short answer that I will give now is that certainly our position is not that the Forest Service must revert to the 2001 framework forevermore. Ultimately, what Legacy seeks is a thorough analysis of environmental impacts associated with replacing the 2001 framework and moving to another plan, in this case the 2004 framework. Part of that would include a robust analysis of alternatives, not just for raising revenue, but also for, for instance, addressing the need to fight fires and that sort of thing. In addition, of course, a hard look at impacts to species and a plan that does ultimately maintain species viability, while also addressing impacts to wildlife. Well, now, am I right in thinking they had a team of scientists, 13 scientists, who debated among themselves and did not agree, but gave different evaluations? I believe, Your Honor, you may be referring to the science consistency review that the Forest Service did along with the 2004 framework? Yes. In which case, if you read the reports of the scientists' review there, most were very, very critical of the 2004 framework, I think is a way to put it lightly. They viewed not only the environmental analysis as insufficient, but they cautioned that the amount of logging that was being allowed would threaten the continued viability of the species. So, in our view, that science consistency review did not support the ultimate decision to adopt the 2004 framework. I am certainly prepared and happy to discuss the merits of our additional claims under NEPA and NIFMA. Our thinking was that those claims had been very extensively briefed on two separate occasions at this point. My intention was to spend most of my time here on the remedy order, which has not been as thoroughly briefed. But I'm happy to entertain whatever questions the Court may have with respect to the merits. Well, as at least my question indicated, the remedy issue would be very helpful. Yeah. Okay. Well, as the Court is aware, then, the district court, having identified the alternatives infirmity, then rejected our remaining claims under NEPA and NIFMA, and after a remedy hearing, basically allowed the Forest Service to continue implementing the 2004 framework without any restrictions whatsoever, pending compliance with NEPA, pending the preparation of this cursory supplemental SEIS. In our view, the district court committed numerous legal errors in adopting this remedy, which in our view is not any remedy at all. As an initial matter, the district court concluded incorrectly that it simply lacked jurisdiction to issue a programmatic injunction or any remedy based on a procedural violation of NEPA. Now, the district court did not identify any, did not cite any legal authority for this proposition, and we submit that that is, that it is completely inconsistent with a host of cases, which we've cited in our briefing, in which this court has indeed upheld or directed programmatic injunctions prohibiting an agency from implementing a plan or rule, a programmatic plan or rule, pending compliance with NEPA. Most recently, it would be perhaps the California, the USDA case involving the roadless rule, but these cases go back as far as the National Parks Conservation Association case, and others cited in our briefing. The Forest Service's attempt to justify this decision on the part of Judge England is based on excerpts from Supreme Court decisions that are taken out of context, that involve standing and ripeness, and ultimately are an opposite in a remedy situation like we have here. And I would like to address the Supreme Court's recent decision in the Summers v. Earth Island Institute case. That case is critically different than the situation that we have here, and that is because in Summers, the plaintiffs asserted that certain locations would be harmed by regulations that exempted projects from notice and comment procedures that normally apply. In this case, by contrast, we assert that certain species will be harmed by the 2004 framework, not necessarily just locations, but also species. And of course, species are not confined to project boundaries. Species move around. So a project that harms, for instance, California spotted owls in the Plumas National Forest in the northern Sierra, take for example the Basin Project, will have an impact not only on legacies members' ability to view and observe and enjoy spotted owls in the Basin Project area, but indeed elsewhere in the Sierra. And we have submitted extensive declarations describing our members' usage of the Sierra Nevada to observe wildlife and the species at risk from the 2004 framework. Legacy need not establish that it intends to visit the precise locations, the exact acre cuts where the harm to these species will occur. And I would point the Court to the recent decision in the Center for Biological Diversity, the Kempthorne case, decided after Summers, which addresses Summers, in which this Court held that plaintiffs who traveled to the Beaufort Sea in Alaska and traveled there to observe polar bears and walruses were harmed by regulations that allowed industry to take, to harass or kill polar bears and walruses, even though they didn't allege and establish precisely where that take would occur. Even though there was an intervening step, the issuance of these permits, and they did not challenge the regulations as applied to any given permit. And other things. Well, may I interrupt you for a minute? Certainly. It seemed to me reading the majority opinion in Summers that it reflected a view on the part of the majority requiring very specific allegations of injury. And while the Ninth Circuit may write a gloss on the Supreme Court, still the Supreme Court is the ultimate arbiter. And just how specific are the injuries, as you have alleged? I think the injuries are very specific, Your Honor. The injuries are an injury to the wildlife species that our members derive concrete enjoyment from. The Supreme Court has held in the Lujan v. Defenders of Wildlife case, which is cited in our brief, that a person who travels to an area of the world where a species is going to be harmed by a federal action is suffering concrete injury for the purposes of standing, and by analogy then also for the purposes of showing irreparable harm or an injunction. So I think that the distinction with Summers, and there's more than one distinction, but the distinction that I would focus on is that the harm associated with the regulations in Summers could not be felt unless the plaintiffs demonstrated that they were going to travel to the project location. In this case, by contrast again, the animals move around. Our ability to observe wildlife anywhere in the Sierra will be harmed if a project moves forward under the 2004 framework. I do need to yield to my colleague, Ms. Richards, at this point, by agreement. But I consider that we do save some time for rebuttal. Good afternoon, Your Honors. Janelle Richards for the State of California. I'd like to start in right with the question of what is California, what would it expect to see as a remedy in this case? That is probably the most important question presented to the Court, and it is set out in our reply brief. The State of California, as it has requested from the beginning, requests that the 2004 framework be set aside, the 2001 framework be reinstated, and that, in addition, California would not object to and, in fact, would support the ability of a limited and fairly specific remand to the district court to consider whether there are additional projects that need to go forward in the public interest because they're critical in the near term for pest or fire management. And I think that if there is a remand in this case of that nature, it is critical that there be very specific direction to the district court on the nature of the remand and the things that will be considered, especially in light of the fact that the 2001 framework, as California set out in its opening brief at pages 12 through 13, allows for substantial fire management and pest control activities. So this is not a situation where reverting to the previous plan leaves the Forest Service without the ability to take action. There is a plan in place, so it doesn't leave a regulatory vacuum. I think it's also important, since Geertsen came out at the tail end of the briefing, to talk about that case and what it requires of the court in looking at the remedy. From the State's perspective, the most important aspect of Geertsen is that it requires a court to look at what part of the remedy comes from the setting aside of the agency action, which is the normal remedy under the APA under 5 U.S.C. 706, when an agency's action is arbitrary, capricious, or an abuse of discretion. Before Geertsen, I think there was less need to unwind what part of the remedy comes from the setting aside and what part of the remedy comes from an injunction, but the Supreme Court was very clear that the court hasn't reached the issue of the nature of the injunction, the scope of the injunction, unless there's something that's not dealt with through the setting aside of the agency action. California, in its papers, has cited cases including Paulson v. Daniels, the recent roadless rule case, Lockyer v. USDA, and also the case of Klamath-Siskiyou Wildlands v. Booty, and that case actually provides some very helpful guidance to this court about how the setting aside of a framework-type plan affects specific projects. In that case, BLM had issued certain amendments to the Northwest Forest Plan, and that governed 24.4 million acres in the Pacific Northwest. In 2001 and 2003, the agency amended that plan in ways that the court then later found to be illegal, in violation of NEPA and the agency's own regulations. The court then set aside those amendments, returning the plan to its previous pre-amendment state, and there were two timber harvests, or timber contracts, that had been awarded in the interim. And the court said in that case, because the underlying regulations of BLM require that all timber projects must conform to the timber harvest, to the forest plan in place, the two projects that were let in the interim did not conform to the plan, now that it had reverted to its previous state, they could not go forward and were enjoined. The court did not, however, apply the four-part injunction balancing test, and said it reasoned that there was no ability to go forward on those projects, except as they were consistent with the Northwest Forest Plan in its reverted state. And so I think a reasonable read of the Klamath case, reading it through the lens of Geertsen, is that when you have a framework plan that specifically requires that projects be consistent with it, there may not be a need for a vacatur, excuse me, for an injunction, if the vacatur gets at the relief that the plaintiffs have requested. And in this case, I direct the court to 16 U.S.C. 1604I, which California cited in its reply brief. And in that case, excuse me, in that statute, the Forest Service is required to ensure that all plans, projects, permits, and instruments of use be consistent with the operative forest plan. So in this case, if we were to return to the 2001 plan, then all projects, arguably, even those with awarded contracts, would have to be consistent with those projects. Doesn't the Forest Service argue that if they had to revert to the 2001 framework, then they're going to have protracted activity, that they have to go re-mark trees, and that they have financial constraints, and this will, in effect, basically set back progress on fire management and the like? There are, yes, and California certainly doesn't want to completely discount those considerations, but in looking at the balance of harms, it is not appropriate to give undue weight to the fact that the agency has known since May of 2008 that there was a fundamental problem with the environmental document, and yet there was a need to award contracts. That shouldn't prevent the court from fashioning appropriate relief in this case. That being said, if there are specific projects that need to go in the near term, that are essential for fire management or pest, if there are specific issues that the Forest Service wants to put in the record on a limited and very directed remand, California would not object to that, because ultimately we do want to proceed in a way that's in the public interest, and it is not in the public interest to prevent fire management projects that are essential. California does not take that position. And California's position on the 2004 is essentially what's the core of your objection to it, that it's cutting too many big trees? The problem with the failure to look at alternatives from the timber harvesting perspective is that as the Forest Service concedes, there are a significant number of large trees that are being cut that do not present a fire danger, and they're being cut primarily to generate funds for the agency. And California believes that it is very important to look at alternatives here, different funding alternatives, perhaps different priorities, to really understand the nature of the problem. And the Forest Service has never really answered the issue of why there is not other things that can be done. And California in its comment letters brought up several different opportunities to overcome this challenge, but the answer can't simply be the only option here to save the forests is to cut them down. That doesn't seem like an acceptable option, at least not without exploring that on the record. The other major issues, of course, that California briefed were that the agency failed to address the very significant concerns raised by state and federal agencies, not only not addressing the substance of those concerns, but also really kind of minimizing the fact that they were made by expert public agencies. There are general references to scientific viewpoints and public concerns, but any person reading that document would not know that there were substantial concerns from the agency's own experts, from state resource agencies, from other federal resource agencies outside of the department. And that is an important part of the agency's obligation in preparing a document such as this, to be transparent, not simply disclose that there are some unknown concerns out there, but to talk about who is raising them, to talk about their substance, and actually to address them. And if I could quickly, I would just address the last issue of standing for the state of California, which came up in the Forest Service's brief. This was fully briefed below. The district court found that the state of California had standing. The Forest Service is citing the Summers v. Earth Island Institute case. In California, this is clearly controlled by Massachusetts v. EPA, which directly addresses the ability of a state to show standing in its proprietary and quasi-sovereign capacity. And with that, Your Honors, unless there are additional questions, we will reserve the remaining time for rebuttal. Thank you. Probably a good idea. Good afternoon, Your Honors. Jennifer Newman for the Forest Service. With me at Council's table are Mike Jackson, who represents the Quincy Library Group, and also Bill Thomas, representing the California Cattlemen's Association. I'd like to reserve some time at the end so that they can address the court. This case is really about how these Sierra Nevada forests will be managed. Everyone, I think, agrees that fire risk is important, that danger from insects and disease are important, and I know at least the state agrees with the Forest Service that economic impacts to these local communities is important. And the district court, in crafting its remedy, considered all of these factors and concluded that the appropriate equitable way to proceed, while the agency supplemented its NEPA analysis on the 2004 framework, was to allow projects that were consistent with the 2004 framework to proceed. And he concluded that for many reasons. He found that neither of these appellants had shown that they would be irreparably harmed if those projects proceeded in that interim period. He concluded that because the public interest, again, all of these factors that I just mentioned, weighed in favor of allowing those projects to proceed and requiring the agency to quickly fix the problems with its NEPA analysis. And he also concluded the balance of harms weighed in favor of allowing those projects to proceed. The only question before this court, jumping to the remedy question, which was addressed extensively by the appellants, is whether or not that conclusion by the district court was an abuse of his discretion for some reason. And the appellants simply have not shown that they are. The Supreme Court has issued several opinions over the last three years emphasizing the extraordinary nature of injunctive relief and the equitable discretion that's committed to the district courts whenever they evaluate these issues. And the latitude that's given to district courts when they craft a remedy. In NEPA cases, the district court need not set aside the agency action. It may issue declaratory relief or, as the Supreme Court said in winter, direct preparation of an EIS or supplemental EIS to address any problems in the NEPA analysis. That's exactly what the district court did here. And that was not an abuse of his discretion. I'm going to continue addressing the injunctive question. I'll get to the merits at the end, unless the court would prefer that I speak to some merits questions now. Excuse me. Sorry, I got something down the wrong pipe. But the district court seemed to think that it was appropriate for him to defer to the agency experts. And I found that a bit strange. It may be in the context. I mean, we're familiar with the Navy and the sonar issues. But I think the court in that case drew a distinction between the Navy's expertise and then the more environmental expertise. You don't defer just entirely to the agency's experts, because if you do, you're basically not. I mean, the government wins. And in this case, you have qualified experts on both sides. The state of California, for example, has strong experts with a similar interest of forest management. I'm not to belittle the environmental groups, but you have two governmental agencies with essentially joint custody over timber lands that adjoin or impact each other. So why shouldn't we remand it to the district court to apply the appropriate level of deference so that the court isn't over-deferring and does a better job, perhaps, of balancing the equities? Well, I first just want to clarify that the state of California did not submit any evidence at the remedy stage. It relied on the evidence that was submitted by the environmental plaintiffs. But to answer your more fundamental question of what the appropriate deference is and how the district court should weigh considerations whenever it's looking to figure out what the appropriate remedy is, I think that, first of all, his deference to the agency here was appropriate, because the agency does, in fact, have scientists who are knowledgeable and expert in questions like, what is needed to do fire management? If we reverted back to the 2001 framework, could sufficient work be done to actually manage the fire risks on these forests? Well, how do those fire experts, that's what I'm a little troubled by, how does the fire expertise interact with the economic driver here, which is they have to allow cutting big trees to get the logging companies interested enough. That seems to be an economic analysis. It's not fire analysis. So in that kind of balancing, I mean, I sympathize with the district court trying to figure out how to weigh all of these things, but I'm troubled if it's all going in the direction of the federal government interest, because there's weighing that needs to be done there. And if it's all just going with the judgment of the Forest Service, then it sort of renders irrelevant the equitable balancing, it seems. Well, I don't think that the district court here was just going with whatever the federal government said. In fact, he said that the analysis that he saw from the federal government was persuasive and thorough and robust. And I think that that is appropriate. In fact, that's what the Supreme Court did in Winter, that's what this court did in McNair. It looked to the evidence that had been put forward by the federal government, examined whether or not it was worth anything, and decided that it was, and decided to defer to some of that analysis. I also don't think, though, that a remand is necessary, even if there may have been, if this court thinks that Judge England stepped over the line a little bit on the weighing of the equities in the analysis of the agency's evidence. I don't think that it has to go back to the district court, because both the State of California and also the environmental plaintiffs here have failed to show that they are going to be irreparably harmed from any of these projects that they are seeking to enjoin. And the Supreme Court has made quite clear over the years, especially recently, that courts should be looking to craft the least drastic remedy possible. And what the plaintiffs here were asking for was a very drastic remedy, asking that any project that was inconsistent with the 2001 framework be enjoined. Now, the state tries to come back from that a little bit here by saying, oh, well, we can remand to the district court, just give us the injunction, remand to the district court, and let the Forest Service come in and show the court why some projects shouldn't be enjoined. But that's exactly what the Supreme Court said should not be done in the Monsanto case. The court said there that it's not enough to say that there's not a reason why an injunction should not issue, but in fact that a plaintiff must show that the injunction should issue, that it's necessary to protect it from irreparable harm, that the balance of the public interest weighs in their favor, et cetera. And so I also want to address the vacature issue. The state has suggested that that is sort of an automatic remedy, and that if you vacate the 2004 framework, that that automatically means that all projects inconsistent with the 2001 framework cannot proceed. And I have to disagree with that. This court itself in the California BUSDA case, the Rowless Rule case, did not look at it as a question of automatic setting aside of the agency action and reinstating of the prior agency action. Instead, the district court had decided to do that, had exercised its equitable discretion. And this court in its review of that decision looked at it just like any other injunction. Did the district court abuse its discretion when crafting that particular equitable remedy for that particular case? And so I think that the state of California and Sierra Force Legacy are both incorrect to suggest that that should have been the default position of the district court. I'd like to ask you a question. If this is a good place to ask a couple of questions, I'd like to do it. That was a very fine presentation. I'd first like to ask you, is the position of this administration the same as the position of the Bush administration? As far as the 2004 framework goes, Your Honor, yes. The Obama administration is not reconsidering that. We have been in settlement negotiations with both plaintiffs here as well as the defendant interveners. While we're hopeful that that may bear fruit, and those conversations also existed under the Bush administration, there's no plan to abandon the 2004 framework. But I will tell you one other thing, which is that these particular forests are in the process of starting up, revising their forest plans in general. And so it's possible there may be some adjustments coming down the road on the individual forest level, but that hasn't happened yet. Well, now, you know from my previous concurrences that I have considerable difficulty in understanding the impartiality of the Forest Service. And I thought a recent major episode probably had crossed your desk, and that is what has happened to the Minerals Management Service in respect to, one, policing oil wells, and two, leasing them. And I don't know that you would have seen the New York Times for May 11th of this year, but Secretary Salazar said there's a clear conflict of interest between policing the industry and getting revenue for the agency by leasing the wells. And he is proposing to at least divide the two functions and not have the revenue-raising group making the judgments. Now, has anything been brought to the Secretary in your department? Any attention been given there to the conflict of interest? Not that I'm aware of, Your Honor. Well, now, let me draw your attention to the regulations in 1502.14. The regulation begins, This section is the heart of the environmental impact statement. And it goes on to say, In this section, agencies shall, A, rigorously explore and objectively evaluate all reasonable alternatives. Now, when the Forest Service is deriving substantial income, how can it possibly objectively evaluate the alternatives? Well, as Your Honor knows, we submitted a supplemental briefing talking about this issue of agency bias and why we believe that it's not a problem. Well, tell me now. Okay. Of course, first of all, nobody, none of the plaintiffs have raised this issue. No, but it's built into the thing. Don't go off and say they didn't raise it. I'm raising it. I understand, Your Honor. But I think that there appears to be some misunderstanding of exactly what the agency is doing with the money that comes in from these timber sales. Isn't it financing itself? There are specific funds designated by Congress, places where the money goes. Some goes to the state, in this case the state of California, to fund things like roads and schools. Some is retained by the Forest Service in something called a brush disposal account, and it's to clean up brush after the sale has occurred, after the timber company leaves. The agency comes in and cleans up the brush. There's also something called the KV Fund, and that fund is for things like planting trees in the sale area and doing other restoration work associated with the sale. I don't think that that's funding the agency in its work. Isn't the agency doing those things? Yes, but it's doing it to manage the forest. Oh, my goodness. And to make sure that the forest is appropriately managed in an environmentally friendly way. No, the question is not is the agency doing good things. I'm sure it's doing good things. The question is, is there a fundamental conflict of interest? And you have not yet said one word to dispel the conflict. Let me say a few other words about the conflict. Congress monitors the agency's budget. The agency has to write a report to Congress every year telling it what receipts came in, what the money was spent on, how much there is. Congress has the opportunity every year to adjust the agency's budget if it thinks that the agency is doing something inappropriate, or even to adjust its statutory mandate. Congress has not chosen to do that. Well, that's quite clear. This is a very old-fashioned way of running a government. Lots of governments have run this way. Make money out of the thing you're doing governmentally. But it just doesn't wash anybody who's sensitive to the bias created by money. Well, Your Honor, you know — Let me give you a homely analogy. You know the old adage about the fox watching the hen coop. Well, in this case, the fox is not only watching the hen coop, but is living by selling the hens. You get your — at least a substantial portion of your money by disposing of the forest you're supposed to guard. Your Honor, I think that that is not accurate. Obviously, there's a lot of money appropriated to the agency by Congress, of course, and it's doing that. Why don't they give it all the money, the needs? It's the simplest thing in the world. I'm sure Congress would love to do that, but we all know that Congress is limited and it tries not to run deficits. Of course, it's doing that now, but it tries not to. So we're going to tolerate a very corrupt system. Corrupt in the sense that the decisionmaker has, weighing with the decisionmaker, money for the decisionmaker. It doesn't reflect on the integrity of the individuals, but it does reflect on the integrity of the agency. And I don't think you said a word to dispel that. Well, let me try this. Try it. This project is one of the projects that has been challenged here by these particular plaintiffs, and that is a project that is actually a net loss to the Forest Service. They're going to have to spend more money out of the Treasury than they are going to make in doing the project, and yet they're going forward with it anyway. This is not an effort by the agency to get as rich as possible or to, you know, benefit from, you know, increased salaries or something like that. That's not possible for the agency. No. But even your example, it's still getting an income. And whether they make money or lose money, they won't be in business unless they get an income. And so since Congress doesn't see the problem, they get the money where they can. I've said enough. I think I've made my point, but you have not made any point. This is a philosophical issue about how government ought to operate. Indeed. It's not. It's a very concrete issue. But in many cases, the police are. Very concrete, based on a philosophy of how government should operate. I'm not sure we can settle it here. Assuming Judge Noonan's view of government, I mean, go beyond that. Congress doesn't want to give money because it doesn't want to have a deficit. It doesn't have to have a deficit. We have such a thing as taxes. It doesn't want to raise taxes. Well, you know, those are all issues that are of concern to people who care about good government. Whether it's a legal question or not, we'll have to decide. I'm sure you're not going to tell us that what you're doing is not only inadvisable but unlawful, are you? No, Your Honor. I'm not going to tell you that. All right. Go ahead. Certainly. You know, I would like to come back to the idea that everyone here agrees that this is an issue of balancing. There are all of these competing interests. And both the Forest Service and the district court, the two entities to whom discretion is normally given, and the folks who make these decisions on a day-to-day basis, have concluded that the 2004 framework is environmentally superior to the 2009 framework. And I don't think that the plaintiffs here have come forward with any reason that this court must disturb the district court's exercise of that discretion in choosing to craft a remedy that is aimed at remedying the NEPA deficiency that was found. I'd like to ---- Well, do you agree with the district court that it lacked jurisdiction to enter a substantive injunction? I do agree with that, Your Honor. But I don't think that this court needs to reach the question because the easier grounds on which to decide the case is that it went on to apply those equitable factors that the Supreme Court has emphasized so much. It concluded that an injunction and, in fact, setting aside of the 2004 framework, that neither of those things were warranted under the equities of this particular case. I'd like to talk just briefly about the merits. And first of all ---- How much time are you leaving for your co-counsel? There's ten minutes left. I was going to try to leave about five for now. All right. Thank you. With respect to the merits, this Court does not have jurisdiction to reach the merits arguments that both the appellants have raised in their brief because there has been this remand to the agency to prepare this supplemental environmental impact statement. And that is under this Court's decision in the Alcea Valley case. And both legacy and the state ---- How would anything in that limited remand to the agency have addressed any of the issues that are fundamental to the merits? Well, the agency is not required to address any of those issues that the appellants are raising. But, of course, it would be free to do so. And the agency is, of course, evaluating all of these alternatives. And it may very well decide on remand to choose an alternative that would satisfy either the state or the environmental plaintiffs. And if it does that, then, of course, this Court would have wasted its effort in deciding these other merits issues. And I don't know how likely that is. It may be unlikely. But the point is that that option is still possible, and, therefore, this Court should not be addressing those other issues because they can be raised later if the appellants are still aggrieved after the remand. And I'd also like to touch just briefly on the issue of ---- It's all been done, right? The remand is all complete. The SEIS is done. It is not complete, Your Honor. The agency issued a draft environmental impact statement that's available on the Internet. I believe we cited it in our brief. But it has not yet been finalized because both sets of plaintiffs here asked the district court to stay its time deadline. And given that, the agency is continuing to evaluate comments and has not yet finalized. So what's the status of what's going on on the ground? On the ground with respect to the supplemental EIS? No, no, in the forest. In the forest, the agency is proceeding. So under your theory, you can get summary judgment in your favor on all the merits on a limited basis on which it had to go back for the supplemental SEIS. That defers any review. And in the meanwhile, the agency can go forward on the theory that there is some theoretical prospect that the agency would actually revisit the substantive issues that the district court has not remanded to the agency. I actually know, Your Honor, the court, as part of its remand, is, of course, free to exercise its equitable discretion to weigh the harms to the various parties and to the public interest. And it could have chosen, and future courts in future cases could choose to enjoin some or all of the agency's activities during the remand. This particular court didn't. So if we were troubled, then, by the fact that the district court didn't, in weighing the equities, take that adequately into account, we could stay the operation? Didn't, if you're suggesting. I didn't see where the district court considered the possibility that the supplemental SEIS would drag on for some long period of time. Meanwhile, all of the activity that's being engaged in in the forest, pursuant to the 2004 framework, would just keep on going and that the state of California and the Sierra Forest legacy would have to wait before they could raise on appeal to this court the merits of their, the main merits of their claim. The court didn't explicitly consider that, but his original order was that the agency had to complete that supplemental EIS by May 1, 2010. It was only when the appellants came in and asked the court to remove that deadline that the district court agreed with them. So, you know, I don't think that a remand is necessary for that, because if the appellants are disadvantaged at this point, that's something of their own making. And the stay order is only in effect for, I believe, six months after this court resolves any appeal. So, again, it wouldn't drag on forever. We're down to about five minutes, so unless there are further questions for the government, I will yield my time. Thank you, Counsel. Thank you. My name is Michael Jackson. I'm here representing the Quincy Library Group and the County of Pumas, where the Basin sale is located, where the Empire sale is located, and just adjacent to the area where most of the Slapjack sale is located. I think it's important that the actual results on the ground matter, and so I want to address in my short period of time the facts of the Basin case as they would implicate the Sierra Nevada framework. I think Judge England did a very fine job in going through the voluminous material that we all supplied, and I'm going to make the following points. But first, I would like to indicate to you that there is, in regard to irreparable harm, a very important declaration that the government filed for the hearing in regard to the remedy. It was by an individual by the name of Peter Stein, who is a Ph.D. who runs the Forest Service's research station. What's his name again? Peter what? Peter Stein. Stein, yes. It's document 186-4. At page 3, he points out that the standard forestry calculation is that small trees are trees less than 20 inches in diameter, and that intermediate trees are trees 20 to 30 inches in diameter. The constant repetition that there are large trees cut in these projects is flat wrong scientifically, and as far as I can tell, there is no evidence to support such a position other than what's in these plaintiffs' briefs, unsupported by scientific information. When the library group started in 1992, I've been working on this for 18 years, we tried to balance using the science and took a program to Congress that was designed to do three things. It was designed to determine whether or not 30 inches, which had always been the owl rule up until that time, was a sweet spot for fire prevention. 30 inches, 40% canopy closure was the 1992 Cow-Owl Science Report upon which the 2001 and 2004 framework was built. Applied to basin, no tree larger than 30 inches is logged in basin. The logging in basin affects 3.4% of the total project area. The purpose of the groups is to allow oak trees and aspen trees and pine trees to reestablish in these over dense forests, to move back to fire resiliency. The purpose of the defensible fuel profile zones authorized by Congress in the Quincy Library Group Program was to determine whether or not the sweet spot, the 30 inches, the 40% canopy closure, would, when it was burned into, protect the area behind it. You will find from the declarations filed by Frank Stewart for the Quincy Library Group in our meager contribution to the excerpts of the record and in the declaration of Bill Wickman for 2Care, all of the information that lays out what the effect of going back to the 2001 framework would be. It would be dangerous to the community for fire reasons, since even the people who supported it at the beginning in the SNEP report have backed away from that position because it does not work. Dr. Jerry Franklin, Dr. Norman Johnson, Dr. Joanne Fites, all who were people who originated the idea that all you had to do in SNEP, the Sierra Nevada Ecosystem Project, that all you had to do was 12 inches or 20 inches, they have completely renounced that. If you look at Dr. Verner, who seems to be the expert relied on by the plaintiffs almost completely, you will find that he retains the view, as expressed in Judge England's ruling at page 25, that the owls in the basin area are widely distributed and they frankly told these owl experts, told Regional Forester Blackwell, that there couldn't be any more owls, no matter what management you used, because the territory was completely occupied. So I think you need to look deeply into the question of whether or not there really are any irreparable harm, any harm of any kind. If you go back to the 2001 framework, the congressional program is essentially over. It only extends to 212. They can't re-plan it again. They've re-planned them four or five times. You just basically would be killing the congressional program. Your Honors, Bill Thomas. If you're out of time, we'll give you an extra two or three minutes, if you'd like. I'll take a minute of it. Okay. You may want to identify yourself. Yes. Bill Thomas. I represent California Cattlemen's Association, who are defending the grazing interest in the 04. We were swept into the timber case by the very broad remedy sought in the complaint. In fact, the complaint is almost silent as to grazing. In the underlying district court, there was no hearing on grazing, thus no judicial record. Only in the briefs before you is there a few references to grazing. I would submit in my limited time that the Forest Service gave very focused, hard look on those particular comments. Some of those, Justice Fischer, were raised by Fish and Game, and certainly Judge England gave critical analysis. We think there are none of the injunction prerequisite of irreparable injury, balance of the hardships, or balance of public interest. And if a remedy is issued here, we think it would be very inappropriate to attach to grazing where these elements haven't been met. We think that would be inconsistent with Winter saying no, all or nothing injunctions. Thank you. Thank you. I'd like to make just three quick points, if I could, in rebuttal. The first, I'd like to address the justiciability issue raised by Ms. Noonan. I think that the Forest Service's decision here is somewhat disingenuous. After the district court issued its judgment, the Forest Service agreed to stay the SEIS process, because it agreed that the outcome of this appeal could affect the scope of the SEIS that ultimately would need to be prepared, and that it would be a waste of time to do that process until this appeal were resolved. Then they actually filed a cross-appeal, and they acknowledged in their briefing that if they had maintained that cross-appeal, then of course the court would have jurisdiction to address the merits of this case. Only after we filed our opening brief did they then dismiss the cross-appeal, and then all of a sudden we have this argument that, in fact, the court can no longer reach the merits. I think it is entirely true that the narrow remand that is now in abeyance is not going to address the other issues, and I think that it is perfectly appropriate for the court to reach the merits at this juncture. Secondly, I just want to address quickly an issue that came up in the discussion about deference to the agencies. I just want to point out that Ms. Noonan cited the McNair case, in which the court did indeed give deference to agency scientists and that sort of thing. Of course, that was in the merits stage of the decision, and of course, when reviewing an agency decision based on the APA, based on an administrative record, the agency is entitled to deference. I think that changes significantly when you determine that the agency has issued a decision that was arbitrary and capricious. At that point, it is for the court to weigh the evidence as appropriate. Finally, I just wanted to address the question that Judge Fischer posed at the very outset, which is what, writ large, is our concern in this case. I think it is fair to say that at the end of the day, our biggest concern is with the logging of the trees over 20 inches in diameter. The evidence in the final environmental impact statement is whether, once upon a time, a tree that was only 30 inches in diameter may not have been a large tree. Today, it is a large tree. I would cite the court to the original 01 FDIS, where it says, Today, most forest plots in the Sierra Nevada have fewer than two trees per acre that are larger than 30 inches in diameter, and 40 to 50 percent have no large trees over 30 inches in diameter. That's at LER 385. Ultimately, as this court pointed out in its previous opinion on this issue, that the agency forthrightly concedes that logging trees over 20 inches in diameter does not address wildfire. It is designed to generate revenue, and proceeding with fuel reduction projects under the 2001 framework will accomplish that goal. Finally, I just want to point out again that within the defense zone of the wild urban intermix, these are the areas closest to communities in the Sierra. The 2001 and 2004 frameworks describe essentially identical treatments, so the logging of the larger trees up to 30 inches can occur in those areas. Thank you. Let me ask you one question. You said that your briefs were adequate on the National Forest Management Act. Are you pursuing that issue seriously at this point? I'm sorry. On the NIFMA claim? Yeah. Oh, absolutely, Your Honor. We absolutely think that the court can address the claim that the 2004— Can or should? I think it appropriately should. Absolutely. And is your basic position that the habitat surveys are inadequate to serve as a proxy for the population data here? Perhaps I'm misunderstanding. There are two separate NIFMA claims. One is specific to the basin project. No, I'm talking about the basin project. Oh, okay. Yes, yes, we are pursuing that claim. The Forest Service acknowledges that they do not have the population monitoring data that is required under NIFMA. Their argument is that— The habitat data can serve as a proxy. Well, their argument is that the post-04 framework MIS amendment that was adopted in 2007 sort of retooled their responsibilities to monitor these species. Our position is that that amendment cannot apply retroactively to projects like the basin project that were already adopted. And that issue is brief. I just want to clarify, though, there is an additional claim that we have raised under NIFMA, which is that the 2004 framework does not, in fact, contain the adaptive management plan that the Forest Service chief believed was necessary to ensure that the framework would maintain viability or that projects like the basin project that implement the 2004 framework would maintain viability. So there are those two separate claims. All right. Thank you all very much. You're having some more rebuttal? Just a little bit more, Your Honors. Just to address a few of the points raised by Ms. Newman. Ms. Newman pointed out or suggested that the district court exercises discretion. And it's very clear in the record, particularly pages CER 16 through 19, that the district court deferred to the agency on every single prong of the test for injunctive relief. It really conducted the analysis as if it were reviewing an agency decision on the record for abuse of discretion. And the problem with that, of course, is it is not for the agency to determine whether an injunction should issue an equity. It is for the court to decide, exercising its own judgment and discretion. Turning to the vacatur issue, Ms. Newman mentioned that somehow this relief is automatic. Again, I will direct the court to Paulson v. Daniels that the court still retains the ability to temper a result, setting aside an agency decision if it's equitable. And so in this case, if the court were to find that 16 U.S.C. 1604I requires that even projects, even timber contracts that have been awarded will be affected by a return to the 2001 framework, on a remand the district court could still make any necessary exemptions or exceptions to serve the public interest. A case that's helpful in that regard is Northern Cheyenne v. Hodel, in which the court found that the district court did not have an adequate record to make an equitable determination and in that instance returned it to the district court to correct that deficiency. I'd like to step back and just look at the practicalities of this case, putting aside rightness and standing and final agency action and all the other arguments that have been brought up in this case. From the state's perspective, the bottom line is that NEPA requires that an agency look at alternatives and that it take a hard look at impacts before it makes a decision. In adopting the 2004 framework, the Forest Service ignored these obligations and as a result a large number of large trees that would not be cut under the 2000 framework will be cut and species that are already on the brink will be extirpated in all or some of the Sierra. If NEPA is to serve its purposes, the Forest Service cannot, as the district court ruled, simply be allowed to proceed as if it had fully complied with the law. Thank you, Your Honors. Thank you. Thank you all. Was it an excellent argument? Very good. We appreciate it. Court will stand at recess. I guess I'm stuck here. Thank you.
judges: Reinhardt, Noonan, Fisher, Cjj